Bronson, J.
The plea of nil debet to an action of debt on the judgment of one of our own courts of record is had. If the defendant wished to put the judgment in issue, he should have. pleaded nul tiel record. (Wheaton v. Fellows, 23 Wend. 375.) The plaintiff is entitled to judgment on the demurrer to the first plea.
There has either been some error in copying the second plea into the demurrer hook, or else it was not drawn with very great skill. Some words are omitted which the pleader seems to have had in his mind, while others are inserted which might better have been left out.
But' there are substantial defects in the plea. It was not necessary to set out all the steps which were taken in obtaining *330 the discharge; but it was necessary to show that the court or officer acquired jurisdiction to grant it. And it is not enough to say in general terms that the court or officer had jurisdiction; but the facts on which jurisdiction depends must be specially alleged. The plea shows that the defendant resided within the jurisdiction of the court; but it fails to show that he presented the necessary papers to put the court in motion. As a voluntary bankrupt it was necessary that he should present a petition setting forth a list of his creditors, their respective places of res* idence, and the amount due to each, together with an inventory of his estate, verified by oath. (Bankrupt Act of August 19, 1841, § 1.) Upon the most favorable construction of the plea, the averment is, that the defendant presented a petition duly verified by such affidavits, schedules and other necessary and proper papers as are required by the bankrupt act. Although it was not necessary to set out the contents at large, he should have stated what papers in particular he presented, so that the court could judge whether they were such as are “ necessary and proper.” The party must plead facts, and leave the law to the court.
The plea does not directly allege that a discharge was granted by any body. But if we look at what the pleader probably intended to say, to wit, that a discharge was granted by Judge Betts, the plea will still be bad. A discharge could only be granted by the court—-not by a. judge. (§ 1, 4, 6.)
Again: The discharge as set out in the plea is restricted to debts “ proveable under the said act;” (and see § 4.) There is no averment in the plea that the debt due to the.plaintiff was proveable under the bankrupt act, and without such averment the discharge does not appear to be a bar to the action.
Finally: There is no averment that this debt was not created in consequence of the defalcation of the defendant as a public officer, or while he was acting in a fiduciary capacity. (§ 1.) The federal courts are not agreed on the question whether one who owes fiduciary debts can become a voluntary bankrupt, so as to obtain a discharge from any of his obligations; but they are agreed that fiduciary debts are not discharged by the certificate, *331 unless the creditor comes in and proves the debt. The plea should have shown that this was a debt on which the discharge might operate.
As it is almost a matter of course to allow such defects as have been mentioned to be cured by an amendment, it will be proper to consider the broader question made at the bar; to wit, whether the discharge, if well pleaded, would constitute a good answer to the action. And here it will only be necessary to notice two facts. The defendant is a voluntary bankrupt, or one who has been discharged on his own motion, and not at the instance of his creditors; and the debt was contracted before the bankrupt act was passed. Upon these facts two general questions' arise; first, whether the insolvent or voluntary branch of the statute is to have a retroactive effect, so as to annul existing contracts; and second, whether it was within the constitutional power of congress to pass the law.
First. A law which nullifies existing contracts, or destroys a right already vested; or which in any other way takes the property of one man without his consent, and gives it to another, is so utterly repugnant to the principles of justice, and so demoralizing in its tendency, that it would be a libel upon congress to impute the intention to pass such a law, unless we can find a justification plainly written in the statute book. It is not to be made out from equivocal expressions, nor by tracing general words into remote and unjust consequences. When there is any room for construction, the law should be taken in that sense which will best stand with honesty and fair dealing.
A distinction may be taken between that branch of the statute which is properly called a bankrupt law, and that which is in truth an insolvent law under another name. A bankrupt law proper is not made for the relief of the debtor, but rather for his punishment. It acts upon him in invitum. At an early day the bankrupt not only forfeited all his estate, but he was treated as a criminal, and might be seized and shut up in prison. And although the rigor of the law has since been very justly abated, it is still the leading feature of a proper bankrupt system that it is a remedy in the hands of the creditor for the col *332 lection of his debt. It enables the creditor to set aside fraudulent conveyances of the bankrupt’s estate, to overreach preferences among creditors, and to seize all the effects of the debtor before they have been squandered, and cause them to be applied to the discharge of his legal obligations. If such a law be made to retroact, it neither takes away vested rights, nor works injustice in any form. The creditor can have no more than his due, and the bankrupt is only charged with the-payment of his debt. No favor is shown to the one, and no wrong is done to the other.
But when we come to that feature in the statute which enables the debtor, without the concurrence, and against, the will of the creditor, to demand a discharge from his legal obligations, very different considerations arise. If such a law be wholly prospective in its operation, it can be subject to no great objection. The credit is then given with reference to the existing state of things. The law may be said to enter into, and form a part of the contract; and when the debtor is afterwards discharged, it is no more than the creditor could have anticipated as a possible event at the time he parted with his property. But if a law enacted after the credit was given be made to retroact so as to annul the prior obligation of the debtor, it will be nothing less than an act of arbitrary power, without the semblance of justice to support it.
If then we find in this statute expressions which look back upon the past, they should, if possible, be understood as applying only to that class of cases where the creditor, and not the debtor, is the acting party. And in other cases, general words should be understood as applying only to future obligations. In this Avay we shall promote justice, and save ourselves from the reproach of having carried the modern doctrine of repudiating debts into the national legislature.
Let us iioav see Avhat foundation there is for the argument that a voluntary bankrupt may be discharged from the debts Avhich he OAved before the statute was enacted. The first section provides, that “ all persons whatsoever, residing in any state, district or territory of the United States, owing debts *333 which shall not have been contracted” in a fiduciary capacity, may present a petition to the proper court, and be declared bankrupts within the purview of the act. The section then goes on to provide, not that all, but that particular classes of persons, to wit, merchants, retailers <fec., may be declared bankrupts at the instance of their creditors. There is much reason for saying that the words “ all persons whatsoever owing debts,” were used to mark the distinction between the two classes of cases for which the statute provides, and not for the purpose of giving a retroactive operation to the law. All debtors may become voluntary bankrupts; but no one shall be declined a bankrupt against his will, except merchants and other traders. The argument for the defendant lays great stress upon the word “owing”—all persons owing debts may present a petition. But clearly the words axe not to be taken in their most literal sense and with this emphasis; for then such persons only could obtain.relief as were owing debts at the time the statute was passed, and those Avho should afterwards become debtors would be without remedy. This shows that the statute is open to construction, and it should be read with reference to the fitness of applying it to any particular description of debts. It may well apply to such debts as are contracted after the law was passed; but it cannot be applied to the prior obligations of the debtor without violating that great principle of jurisprudence which forbids that a statute should be so construed as to annul contracts, or take away vested rights. Even if the thing be within the letter, the statute shall, if possible, be so read as not to touch it. I will presently refer to some of the authorities which support this position.
Although this statute had but a brief existence, it was professedly enacted for all time to come ; and the great, if not the only object of the legislature must have been to provide for the future. If it had been the intention of congress that present as well as future obligations should be discharged, it is bút reasonable to suppose that they would have used words so plainly manifesting that intention as not to leave it an open subject for discussion. When our own legislature, in the year 1811, were *334 about to provide a jubilee for all debtors, they took care to say in express terms, that 44 any insolvent debtor who now is, or hereafter shall be imprisoned on any civil process, or who now is, or hereafter may be” sued, may present a petition and obtain a discharge. (6 Web. 200.) That law, so far as it acted upon the past, has long since been declared unconstitutional and void by the supreme court of the United States. I ought in justice to add, that the law. was almost universally condemned by the people, and it was repealed at the end of ten months from its enactment, long before it had been declared void by the judiciary. (6 Web. 349.)
The fourth section of the act of congress declares, that when the bankrupt has conformed to all the requisitions of the act, he shall be “ entitled to a full discharge from all his debts ;” and the same shall be deemed 41 a full and complete discharge of all debts proveable under this act.” And the fifth section provides, that44 all creditors” may come in and prove their debts, including such debts as 44 are not due and payable until a future day;” and including also 44 uncertain or contingent demands.” Now upon the principles already stated, the words 44 till debts” as here used, should be understood to mean such debts as might be coritracted after the passing of the act. The words may have a wider influence when applied to cases of involuntary bankruptcy, where the law acts on the debtor by way of giving a new remedy to the creditor. But they cannot be applied to the existing debts of the voluntary bankrupt, without violating a rule of construction which has its foundation in the immutable principles of justice.
It is a general rule that a statute shall not be so construed as to give it a restrospect beyond the time of its commencement. (2 Inst. 492; 1 Black. Comm. 45, 6; Bac. Ab. Statute (C).) This is not only the doctrine of the common law, but it is a principle of general jurisprudence. (Dwar. On Stat. 680; Dash v. Van Kleeck, 7 John. 477, per Kent, Ch. J.) And general words in a statute shall be so restricted as not to do a wrong to any one. The statute of Glocester, ch. 1, provided that the disseisee should recover damages in a writ of entry founded on *335 a disseisin, against him which is found tenant. And yet Little-ton says, that one who did not agree to the feoffment by which he was made tenant, and never took the profits of the land, shall be discharged of the damages, although he is found tenant, (Litt. § 685.) Lord Coke in his commentary upon the section says, “here it appearetli that acts of parliament are to be so construed, as no man that is innocent, or free from injury or wrong, be by a literal construction punished or endamaged. And therefore in this case, albeit the letter of the statute is'general to give damages against him that is found tenant,” yet, as the defendant was not in fault, “ he shall not be charged Avith the damages.” (Co. Litt. 360, (a).) The case of Gilmore v. Shuter, is reported in several books. (1 Freem. 466; T. Jones, 108; 2 Lev. 227; 1 Show. 17; 2 Mod. 310; 1 Vent. 330.) There Avas first a parol promise made in consideration of marriage. Then came the statute of 29 Car. 2, cii. 3, declaring “ that no action shall be brought whereby to charge any person upon any agreement in consideration of marriage,” unless the same shall be in writing. Nothing could be more comprehensive than this language. It included promises Avhich had already been made, just as plainly as it did those Avhich should be made in future. And yet in this action, Avhich Avas commenced after the passing of the act, the plaintiff Avas allowed to recover upon the parol promise. Although the express Avords of the act Avere strongly pressed upon the consideration of the court by Serjeant Maynard, they held that past promises Avere not Avithin the statute, “ for it Avould be very unreasonable to put such a construction upon the act, as should make it have a retrospect to invalidate and nullify contracts and agreements that were _ lawful at the time when they Avere made.” A case Avas mentioned by the court Avhich is directly to the present purpose. Another branch of the statute of frauds had provided that “ all devises and bequests of any lands” shall be in writing, and be attested by three or four creditable Avitnesses, “or else they shall be utterly void and of none effect.” And yet the court said, it had been resolved, that a Avill made before the statute Avas passed, though not so attested, Avas good, although the tes *336 tator did not die until after the statute was enacted. . And that was truly said to he a stronger case than the one in hand, “because the party might have altered his will, if he had pleased; but an agreement [he] cannot, without the consent of the other party.” In Ashburnham v. Bradshaw, (2 Atk. 36,) there was a devise to charitable uses; then came a new statute of mortmain declaring all such dispositions of property to be void; and after-wards the testator died. The case was referred for the opinion of the judges, who certified that the devise was good notwithstanding the statute; and Lord Hardwicke thereupon established the will, and directed the trusts to be carried into execution. A like decision was made upon the same statute in Attorney General v. Andrews, (1 Ves. Sen. 225.) And see Wilkinson v. Meyer, (2 Ld. Raym. 1350.) In Couch v. Jeffries, (4 Burr. 2460,) the same rule of construction was applied to another statute. Although the plaintiff’s case was clearly within the words of the act, his right was saved by denying the retroac-. tive operation of the law. Lord Mansfield said, “ here is a right vested, and it is not to be imagined that the legislature could by general words mean' to take it away. They certainly meant future actions.” The same doctrine was fully maintained by this court in Dash v. Van Kleeck, (7 John. 477.) The questitin was, whether a statute subsequently passed, should take away a right of action already vested in the plaintiff;. and the court held it should not, although the case was plainly within the words of the law. Thompson, J. said, “it is repugnant to the "first principles of justice, and the equal and permanent security of rights, to take by law the property of one individual, without his consent, and give it to another. The principle contended for on the part of the defendant, inevitably leads to, and _ sanctions such a doctrine.” He added, “ it never can be presumed from the general .words of this statute, the legislature intended it should work such injustice.- Nothing short of the most direct and unequivocal expressions would justify such a conclusion.” He said further, that the act established a new rule, “ and as such, ought not to have a retrospective operation, *337 unless so declared in the most unequivocal manner, which it certainly is not.” These views were fully sustained in the opinion delivered by Chief Justice Kent, who proved that the same doctrine prevails in the civil law. Indeed, it is so consonant with the principles of natural justice, that it must be found every where, until we get beyond the limits of civilization.
These authorities are precisely in point, and I think them sufficient to establish the position that the general words in this statute should not be so construed as to nullify contracts which had been made before the law was passed. But there are one or two other clauses which are supposed to have a bearing upon the question. Merchants, bankers, &c. who do not keep proper books of account after the passing of the act, and persons who subsequent to that time apply trust funds to their own use, cam not be discharged. (§ 4.) And the second section declares void all future payments &c. made by the debtor in contemplation of bankruptcy, and for the purpose of giving a preference among creditors; and also declares void all conveyances &c. made by the debtor in contemplation of bankruptcy, to any person not being a bona fide creditor, or a purchaser for a valuable consideration, without notice. I am unable to see that these provisions give much color for the argument that the statute must have a retroactive effect. They merely put men upon their good behavior, by telling them that if they commit certain frauds, they shall never have a discharge under the bankrupt act, and then go on to make void certain other acts tending to the injury of creditors. But another part of the second section is said to have a strong bearing in favor of the defendant. The clause is as follows: If it shall appear to the court “ that the bankrupt, his application being voluntary, has, subsequent to the first day of January last, or at any other time, in contemplation of the passage of a bankrupt law,” given a preference to one creditor over another, he shall not be discharged, “ unless the same be assented to by a majority in interest of those of his creditors who have not been so preferred.” It is undoubtedly true that this clause looks backward; but it only acts upon the debtor, and denies a discharge in all future time to one, who, in the *338 expectation that a bankrupt law would be passed, has done an act which would be a fraud upon the law if it were already in existence. It does not necessarily show that the discharge oí existing debts was contemplated by the framers of the law. It contains, at the most, only an inference to that effect; and although the inference is a pretty strong one, there is an absence of those express words which are necessary to give a retroactive operation to a statute where the effect will be to take away vested rights.
We have not been referred to any other provision as favoring the conclusion for which the defendant contends; and if we do not look beyond the law itself in search of the intention of its framers, I think we are bound to say that this debt has not been discharged. The history of the times has been drawn into the discussion for the purpose of proving that congress must have intended to blot out present, as well as future contracts. I know that the country abounded in debtors at the time this law was made, and that congress was strongly pressed to legislate for the past, as well as the future. But it does not follow that the law makers yielded to this influence, and consented to do a wrong to creditors. And before we are at liberty to say that congress intended to take the property of one man and give it to another, we must see that intention so plainly manifested that he who runs may read.
I am ready to admit that the question is not free from difficulty, and knowing that the commonly received opinion has been that present as well as future debts may be discharged, I cannot but entertain some doubt of the soundness of my own conclusion. But on the authority of the cases which have been mentioned, and others which might be cited to the same effect, I am of opinion that the law should not be so construed as to nullify pre-existing contracts.
tSecond. If I am mistaken in the conclusion that the act was not intended to operate upon debts which were contracted before the law was passed, it then becomes important to inquire whether congress had the constitutional power to pass that branch of the statute which provides that all persons, without regard to their *339 occupations or pursuits, may become voluntary bankrupts, and be discharged from their debts. And here, although we are treading upon delicate ground, we have no choice but to occupy it. The question has been made in this and several other cases, and we must pass upon it. As the question arises under the constitution and laws of the federal government, its ultimate decision may rest with the supreme court of the United States; and I cannot but regret that the matter did not come before that tribunal at its last session in such a form as to admit of a final adjudication. We should then have had no duty to perform but that of following in the path which they had pointed out. But having no such guide, we must find our way as well as we can to the end of this important inquiry.
It is proper to remark at the outset, that the federal government is one of defined and limited authority. It can only exercise the powers which have been expressly delegated to it, with such as are necessary for carrying those powers fairly into effect. This great principle has not only been generally admitted, but it is now a part of the fundamental law. (l0th Amendment.) We must then look into the constitution to see whether the power to pass this law has been granted to congress. If it has not been granted, it does not exist. I am thus particular in stating the principle, for the reason that although every one is ready to admit it in words, its practical importance has not always been felt.
The only authority to legislate upon this subject is contained in the following words:—“Congress shall have power to establish uniform laws on the subject of bankruptcies throughout the United States.” The argument in support of the law is, and must be, that bankrupt and insolvent—bankruptcy and insolvency—are synonymous terms, and that when the convention spoke of “bankruptcies,” they intended to cover the whole field of insolvency, or inability to pay debts. To my mind nothing can be more clear than that this position cannot be maintained by any fair course of reasoning.
As late members of the British empire, the states and the people were well acquainted with the laws and legal institutions *340 of England at the time the constitution was framed and adopted. This enabled the convention to lay down in few words the fundamental principles upon which the federal government was to be established. There was little occasion for definition where they were speaking of any matter which was already known to the laws of England. A single word was often sufficient to mark both the nature and extent of a power or prohibition. It is in this way that the constitution speaks of taxes, duties, imposts, excises, bankruptcies, the writ of habeas corpus, ex post facto laws, bills of attainder, and other subjects. No definitions are given, and without looking into the laws and legal institutions under which we had previously lived, we.have no means of ascertaining what was meant by these terms. Now I take the principle to be entirely clear, that when the constitution speaks in this way of an established institution, or of any proceeding already known to the laws, and no enlarging or qualifying words are used, it must be understood to speak of the matter as it then existed. I do not mean to affirm that the thing will not be subject to any new modifications, so long as the substance is preserved. But I do mean to say, that when congress attempts to engraft a principle which is entirely new, upon an acknowledged power, it will be just as much beyond the limits of its authority as though the power itself had not been granted. Any other doctrine would at onde confer unlimited authority upon the federal government. Congress would have but to say that any law which it might choose to pass was referable to some particular power, no matter what, and all mouths would be effectually stopped. Such a proposition needs but to be stated to ensure its rejection. '
Prior to the adoption of the constitution; hó such thing as a bankrupt law, eo nomine, had been enacted in this country. But in England there was a complete system of bankrupt laws, which had been in use for more than two centimes. There had also for a long period been another and an entirely distinct set of laws in that country, which related to insolvent debtors. These two sets of laws were not only distinct in their enactment, but they applied to different classes of persons, and were *341 based upon different principles. The bankrupt laws were confined in their operation to merchants, traders, and persons who gained their livelihood by buying and selling; Avhile the insolvent Iavvs extended to all classes of imprisoned debtors. The bankrupt Iuavs were set in motion by the creditor, and were a remedy in his hands for the collection of his debt; but the insolvent laws were set in motion by the debtor, for the purpose of obtaining his enlargement from prison. Under the bankrupt system the debt Avas discharged: the insolvent system left the debt unimpaired. The povver delegated to congress Avas to legislate upon one, and only one of these subjects, to Avit, “ bankruptcies.” The law Avhich has been enacted under color of the power extends to and covers both; and is, besides, more extensive in its influence than the two English systems when combined. . Upon this short statement of the case I see no possible ground on which the insolvent branch of the IaAV can be supported as a constitutional exercise of power. But the importance of the question requires that it should receive a more extended examination.
The first inquiry will be Avhether congress can pass a bankrupt IaAV which shall extend to persons Avho are not engaged in any branch of trade. I think they cannot. The question is not Avhat might be accomplished by the “ omnipotence of parliament;” but what A\ras the use and meaning of theAvord bankruptcy at the time the constitution was adopted. And should Ave find that the laws and the lexicographers are at variance upon the point, Ave must, I think, take the word in its legal sense. I need not cite books to proArc that technical words must be understood according to their technical meaning. But Ave shall find nothing like a conflict of opinion between the laws and the philologists upon this question.
It has already been mentioned that the operation of the English bankrupt lows was always confined to merchants and traders, or persons Avho gained a livelihood by buying and selling. Bankers Avere included because they Avere traders in money and exchanges. The remaining, and by far the most numerous classes in the community, were never subject to the *342 operation of the system. Lord Coke, who looked upon bankruptcy as a crime, says, “we have fetched as well the name as the wickedness of bankrupts from foreign nations.” And he tells us that the first statute on the subject was made “ against strangers, viz. against Lombards, who, after they had made obligations to their creditors, suddenly escaped out of the realm without any agreement made with their creditors.” He calls them merchants, though I believe the Lombards were more commonly known as bankers and usurers, who dealt in money and exchanges. (4 Inst. 277.) Blackstone derives bankrupt “ from the word bancus or banque, which signifies the table or counter of a tradesman, and ruptus, broken; denoting thereby one whose shop or place of trade is broken and gone.” He defines a bankrupt to be “ a trader who secretes himself, or does certain other acts tending to defraud his creditors;” and he gives the reasons why the bankrupt laws were never extended to any other class of persons. (2 Bl. Com. 285, 471, and note.) Doctor Johnson derives the word bankrupt from the French, banqueroute, and the Italian, banco-rotto, and tells us that the money-changers of Italy had benches in the burse or exchange; and that when any became insolvent, his banco was rotto—his bench was broke. His definition I will notice hereafter. Bailey, in the 21st edition of his dictionary, published in 1766, says a bankrupt is “one who by the laws of the land is obliged by his creditors to yield up his goods &c.; also a trader who breaks, and steps aside by design to defraud his creditors.” Richardson, in his great dictionary recently published, agrees substantially with Blackstone, both in the derivation and definition of the word bankrupt; and so also do Jacob and Tomlins in their law dictionaries. Doctor Webster in his most valuable dictionary, after giving the derivation of the word bankrupt, defines it thus: “1. A trader who secretes himself, or does certain other acts tending to defraud his creditors. 2. In a less technical sense, a trader who fails or becomes unable to pay his just debts: an insolvent trader. In strictness, no person but a trader can be a bankrupt. Bankruptcy is applied to merchants and traders ; insolvency to other persons.” See further *343 on this point Adams v. Storey, (1 Paine C. C. Rep. 79;) and 1 Dane’s Abr. 317,318. Chancellor Kent says, “ bankruptcy in the English law has, by long and settled usage, received an appropriate meaning, and has been considered to be applicable only to unfortunate traders, or persons who get then livelihood by buying and selling for gain, and who do certain acts which afford evidence of an intention to avoid the payment of their debts.” (2 Kent, 389.) The new English bankrupt act, 6 Geo. 4. ch. 16, still confines the system to traders, and has done no more upon this head than to supply defects in definition, so as to include all who may properly come under that term. (Eden Bankr. Law, XIV.) Bell, in his commentary on the laws of Scotland, says, “bankruptcy is a status or condition fixed by legislative provision.” (2 Bell’s Com. 214, and see p. 161, 2.) Crabb, in his English Synonymes, points out the distinction which has been mentioned between bankruptcy and insolvency ; and he did not speak as a lawyer, but as a master of language.
Thus we find that the philologists and lawyers are agreed upon this point; and there is certainly no reason why they should differ, for the English word bankrupt had its origin in the incidents of trade and commerce, and has come down to us in that connection, and through the medium of the laws. It is quite clear, therefore, that whatever secondary or figurative meaning the word may have acquired, its primary, and its only legal signification, is that which confines it to traders.
Now what" can be opposed to these authorities ? Doctor Johnson defines bankruptcy thus—“ 1. The state of a man broken, or bankrupt. 2. The act of declaring one’s self bankrupt.” The adjective bankrupt he defines thus-—“ in debt beyond the power of payment;” and the verb—“to break; to disable one from satisfying his creditors.” Although he has omitted to specify a particular class of persons, he has not said that the word is applicable alike to all classes; and his want of entire accuracy cannot prove much, for he has come nearer to the point than laymen usually do when they venture upon the definition of legal terms. There are some other lexicographers of far less celebrity, who, in compiling books for the use of schools, or for *344 the purpose of giving the true pronunciation of words, have been content to take their definitions from any source where they could find in few words what would answer then purpose. I have not looked to see how many such can be found, for if it should ten out that there are a dozen of them, it would prove nothing upon this question.
As a state of insolvency usually precedes and is attendant upon bankruptcy, it is not surprising that the two words should sometimes be confounded; and hence it is that in common parlance the word bankrupt has occasionally been applied to an insolvent farmer, physician, lawyer, mechanic, or other-person who had not been engaged in trade. But the distinction' between the two words is so strongly rooted in our language, that even among the unlearned- the word bankrupt was very rarely applied to any other class than merchants and traders, until congress attempted to ten debtors of all descriptions into bankrupts.
Insolvency is said to be the generic term, comprehending bankruptcy as a species. (2 Bell’s Com. 162; Web. Dict., Insolvent.) If this be true, it will not uphold this law, for congress has unfortunately attempted to enlarge a power which goes only to the species, so as to- include the whole genus. But the case is still worse, for although insolvency is undoubtedly the larger term, there is no necessary connection between the two things. A man may be insolvent without ever becoming a bankrupt, or. having the capacity to become such; and a bankrupt may prove to be entirely solvent. Mere insolvency never makes one a bankrupt without the concurrence of some act tending to the injury of his creditors; and when there has been such an act, the man may be declared a bankrupt, however able he may be to pay his debts.
I know that a figurative use has sometimes been made of the word bankrupt. Johnson and Richardson have collected examples from Shakspeare and other poets and writers, where a man has been said to be bankrupt in wit, intellect, or character. But I presume no one will affirm that the convention had in *345 view any such use of the word, or that congress has the power to relieve against such faults and misfortunes.
I must not omit to mention the fact, because it has been supposed to be a matter of some consequence, that the statute, 34 and 35 H. 8, ch. 4, which is the first of the English bankrupt laws, was not in terms confined to merchants and traders. But it is evident from the whole scope of the act, when taken in connection with the state of trade and commerce at that period, that none but merchants were intended to be included in its provisions ; and Coke speaks of this statute as though it was only applicable to merchants. (4 Inst. 277.) Within thirty years afterwards, and when new branches of trade had been opened, the law was extended by the statute 13 Eliz. ch. 7, so as to include not only merchants, but all persons “ seeking his or her trade or living by buying and selling.” Other statutes followed, (see 1 James 1, ch. 15, and 21 James 1, ch. 19,) in which the persons who might be proceeded against as bankrupts, were still more carefully specified. There is not, I believe, so much as the shadow of an authority in the books for saying, that in point of practice the English bankrupt system was ever extended, at any period, to all classes of persons.
It is proper to mention here, that our first bankrupt law, which was passed in the year 1800, was, in all its leading features, based upon the English bankrupt system. This law was passed while most of the men who had taken part in framing and ratifying the constitution were still living. As a practical construction of the bankrupt power, no one can deny that it is a precedent of great importance. At that period no one seems to have supposed that the power of congress extended over the whole subject of insolvency; and probably few persons would ever have thought of such a thing, if we had not witnessed the sad consequences of idleness, extravagant living and gambling speculations! But none of these things can alter the constitution.
I have met with no authority for saying that- a bankrupt law may be extended to all .classes of debtors, save what may be found in one of the numerous elementary books of Hr. Justice *346 Story. In his commentaries on the constitution, he has the following note: “ Perhaps as satisfactory a description of a bankrupt law as can be framed, is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts.” (3 Story On Const. 13, 14.) No authority is cited in support of this definition, except a debate in congress, which, to say the most of it, proves as much against, as it does in favor of the doctrine; and I must be permitted to add, that a legislative debate in modern times proves very little on any subject. Let us glance for a'moment at the consequences which may follow, should this doctrine be established. “ A law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts.” If that be so, congress may, trader the bankrupt power, restore the law of imprisonment for debt, which has been abolished in this and several of the other states. And much more than that, congress may take upon itself the whole business of regulating the collection of debts; may abolish the state laws, and the whole civil jurisdiction of the state courts; and may give to the federal courts the exclusive jurisdiction over all matters touching the relation of debtor and creditor. It is impossible to deny that these consequences are the legitimate offspring of the doctrine advanced by the learned commentator. And can any one believe for a moment that either the convention, the states, or the people intended to confer such powers upon the federal government? Does the author of the note believe it? I presume not. And I ought in justice to say, that the doctrine was only put forward with a “ perhaps,” and without the benefit of having heard the question discussed by counsel; and from the known candor of the author it is not to be doubted, that when the subject comes to be examined by him as a judge, it will receive the same careful and able investigation which it would be sure to command under other circumstances.
*347 Before leaving this branch of the case it is proper to say, that there is no middle ground between taking the legal signification of the word bankrupt, and the substitution of the word insolvency, Avith all the consequences which have just been suggested. The Avit of man cannot point to a Well defined resting place between the two extremes. When the supreme court of the United States shall decide that the power spreads over the Avhole field of insolvency, I shall submit; because, as the question arises under the constitution and laws of the union, it will be my duty to do so. But until then, I must be permitted to entertain the opinion that a law “ on the subject of bankruptcies” must be confined, as it always was prior to the year 1841, to debtors who are engaged in some branch of trade.
It has been said, that upon this construction there Avill be great difficulty in specifying the classes of persons Avho may properly be subjected to the operation of a bankrupt law; and this has been deemed an argument of some importance in sup port of the law under consideration. But there is very little of truth in Avhat is alleged as the groundwork of this reasoning ; and if the supposed difficulty really existed, the argument based upon it Avould be good for nothing. The improvements Avhich have from time to time been made in the English bankrupt laws, based upon long experience of their practical operation, must furnish the means of specifying Avith sufficient accuracy Avho may, and who may not come within the operation of the system. And I may add, that this specification was actually made in our own bankrupt law of 1800 ; and so also it Avas by the laAV of -1841, when we come to that branch of it Avhich may properly be termed a bankrupt law. But however great the supposed difficulty may be, it clearly cannot have the effect of enlarging the poAver.
The next feature which I shall notice in a proper bankrupt system is, that there must be something more than the mere non-payment of debts—some act must be done by the trader, Avhich the law has declared to be'an act of bankruptcy—before he can be brought under the operation of the system. So are the English bankrupt laws; so was the law of 1800; and so *348 too is tiie bankrupt branch of the law of 1841. And here I will refer once more to the definition of Blackstone. “A bankrupt is a trader who secretes himself, or does certain other acts tending to defraud his creditors.” The law dictionaries hold the same language. Chancellor Kent says, “ bankruptcy in the English law has, by long and settled usage, received an appropriate meaningit is applicable to traders “ who do certain acts which afford evidence of an intention to avoid payment of their debts.” (2 Kent, 389.) Now let us consult some of the most approved lexicographers. Bailey defines bankruptcy, as the “ act of turning bankrupt.” Webster and Richardson agree entirely in the definition of Blackstone.
In a proper bankrupt system, the law, like all other laws for the collection of debts, is made for the special benefit of the creditor, and can only be set in motion at his instance. So are the English bankrupt laws; .so was our own law of 1800; and so is the bankrupt branch of the law of 1841. “ One distinction has ever existed, that is, an insolvent act has ever operated at the instance of the debtor imprisoned; but bankrupt laws at the instance of the creditors.” (1 Dane Ab. 317.) No such thing was ever known prior to 1841, as that a man should declare himself a bankrupt, and demand a discharge in defiance of his creditors. It may be remarked here, that for a long time these laws afforded no relief of any kind to the bankrupt. Neither the 34th and 35th H. 8. ch. 4, nor the 13 Eliz. ch. 7, provided for the bankrupt’s discharge. The creditors seized on all his estate for the payment of their debts, and if they were not fully satisfied the bankrupt remained liable for the balance. It was not until the reign of Anne, that the bankrupt, on conforming to all that was required of him, obtained a discharge from so much of his debts as had not been-satisfied under the commission. It still remained for the creditors to adopt this remedy or not, at their pleasure. If they elected to sue out a commission, they got the effects of the bankrupt, and he was discharged. But it was never in his power to move in the matter, and say to his creditors, “ I will have a discharge whether you agree to it or not.”
*349 Under the English system, the bankrupt could not be discharged until five-sixths of the creditors had assented to it by signing his certificate. By our own bankrupt law of the year 1800, the consent of two-thirds in number and value of the creditors who had proved their debts under the commission was required before the bankrupt could be discharged. Thus we see, that the proceedings were not only commenced by some one or more of the creditors, but the consent of the creditors as a class was a necessary prerequisite to the granting of a discharge.
There was at the same time another, and an entirely distinct system of laws in operation in England for the relief of insolvent debtors. The first of these laws was passed as early as the 22 and 23 Charles II. ch. 20, and at the time of our revolution there were not less than thirty British statutes on the subject. These laws relieved the debtor from imprisonment on surrendering his property; but left his future acquisitions still liable for the payment of debts. They answered very nearly to the cessio bonorum of the Roman law, which did not discharge the debt, but only released the debtor from confinement. We see, then, that there were two distinct and independent systems in operation touching the relation of debtor and creditor; and it will be found on examination that these two systems related to different classes of debtors, were based on different principles, and administered by different tribunals. Several of the colonies had also enacted insolvent laws, with some modifications of the British statutes, while the other colonies had taken the British insolvent system as they found it.
A brief notice of the law under consideration will render the application of what has been said plain and obvious. What has congress done 1 It has given us a law in two distinct branches, one of which contains several of the leading features of a bankrupt law proper. It is confined to debtors who are engaged in some branch of trade, and who have done certain specified acts which are made acts of bankruptcy. Against such a debtor the creditor may institute proceedings, and may thereby overreach unjust preferences, set aside fraudulent conveyances, and seize *350 on the bankrupt’s estate before it is wasted, and cause it to be applied to the satisfaction of his debts. In these particulars it is just such a system as the convention, and every intelligent man in the United States at the time the constitution was adopted, must have intended by the power conferred upon congress to legislate “ on the subject of bankruptcies.” And in my humble judgment it filled the -measure of the power. There was no room for another drop of constitutional legislation on the subject. But congress has attempted to do a great deal more. It has added another, and an independent branch of legislation. Losing sight of those features in a bankrupt system which confine it to merchants and traders, and make it a remedy in the hands of the creditor, congress has extended this branch of the law to “ all persons whatsoever—owing debts and this new, and by
far the most numerous class of debtors, are to come under the operation of the law or not, according to their own pleasure, without any power of coercion in the creditor. It would sound strangely in the ears of an English lawyer, or of any of those distinguished jurists of our own country who were on the stage at the time the constitution was adopted, to tell them of a bankrupt law extending to all classes of persons, and which was made for the exclusive benefit of the debtor. And it will sound strangely enough to us so soon as we have fully recovered from the spasm which produced this enactment.
This statute not only brings in the English insolvent laws under a new name, but it gives them a scope and influence which they never had before. Instead of stopping where the insolvent laws did, with the release of the debtor from imprisonment, this law goes further, and annuls the obligation of the contract. And what is still worse, upon the construction for which the defendant contends, it has a retrospective operation, and nullifies contracts which had been made before the law was passed. This, too, is done without the consent of creditors, either as individuals, or as a class governed by majorities. The respect which I feel for those who enacted the law has not overcome the convictions of my own judgment, that this was not a constitutional exercise of power. Indeed, I think the opinion *351 of congress itself may be cited against the validity of the law; for it has been repealed by the very same body of men which enacted it. But whether the members became themselves satisfied that the law was unconstitutional, or whether they yielded to the force of public opinion, is not a very important inquiry. That the law has been very generally condemned no one can deny.
Let us see where a bankrupt system might end if the principles asserted in this law were fully carried out. If the power of coercion may' be denied- to the creditor as to any particular class of debtors, then it may be denied in all cases. This would give us a system made for the exclusive benefit of the debtor, which would contradict all that has ever been enacted or written on the subject of a bankrupt law. Again: If persons not connected with trade may become voluntary bankrupts, then it is entirely clear that congress can extend the system in its compulsory form, so as to authorize the creditor to sue out a commission against airy debtor, whatever may be his pursuit or occupation. Such a law would be without any warrant in the history of the past, and could not fail to shock the whole community. Our farmers, planters and mechanics, to say nothing of many other classes which are not engaged in trade, are not always very exact in paying their debts at the day, although they may be solvent; and if a commission could be sued out against such persons, it could hardly fail to prove ruinous to them, and that too without benefiting the creditor. The effects of the debtor would not be likely to constitute more than what Lord Eldon called “ stock in trade for the commissioners, the assignees, and the solicitor.” (6 Ves. 1.) I do not believe that any member of the federal convention, or any lawyer or statesman who acted upon the adoption of the constitution, ever dreamed that the bankrupt system could be rightfully extended to persons who were not connected with trade and commerce. The Federalist has but a single paragraph upon the subject, which is contained in the 42d number, written by Mr. Madison. It is as follows: “ the power of establishing uniform laws of bankruptcy, is so intimately connected with the regulation of *352 commerce, and will prevent so many frauds where the parties or their property may lie, or he removed into different states, that the expediency of it seems not likely to be drawn into question.” We have here, in few words, the reasons of the convention, set forth by one of its most distinguished members, for delegating the bankrupt power to congress; and these reasons were laid before the states and the people for the purpose of inducing them to adopt the constitution. The power was not given to congress for the purpose of enabling them to embrace the whole subject of insolvency; but because bankruptcy was “ intimately connected with the regulation of commerceIt was not given for the special, and certainly not for the exclusive benefit of debtors; but to prevent the “frauds” which they might otherwise practice; and those frauds would be likely to be most common “ where the parties or their property may lie, or be removed into different states.” Here, again, we are plainly pointed to the operations of trade and commerce. If the power had been supposed to extend to laws which should reach the farmer of the north, and the planter of the south, no one can well believe that it would have found an advocate in Mr. Madison, or that the constitution would ever have been adopted.
But the principle asserted by this act of congress reaches a still wider field than we have yet surveyed. If the law comes within the power, it must be because congress is not tied down to any particular system of laws touching the relation of debtor and creditor; but has power over the whole subject of insolvency, talcing the word in its largest sense. This covers the entire relation of debtor and creditor, so far as relates to their rights and remedies in case the debt is not paid. Congress has but to exert its authority, and the whole civil jurisdiction of the state courts, from the highest to the lowest, will be blotted out. And still more. If the power does not refer to any system of laws, but is to be understood as speaking of insolvency in the abstract, then congress need not require the debtor to go through the forms of asking a discharge ; but may at once absolve him from his obligation, and tell the creditor he is a creditor no longer. There need be no surrender of the debtor’s estate. He *353 may keep it, if such be the will of congress. I do not see how it is possible to deny that these consequences may follow, if the principle asserted by this law can be defended. It is no answer to say that such powers will not be exercised. The question is whether they have been granted. I think not. Every one knows that the states were jealous of their rights, and that nothing pertaining to their sovereignty was yielded to the federal government, unless the grant was either essential to the existence and efficiency of that government, or the well being of the whole people, and in all cases the utmost caution was observed in making the grant. Powers were not bestowed on the assumption that they would not be used. There were good reasons for giving congress the power over bankruptcy, as that term had always before been understood; but not for going further and including the whole relation of debtor and creditor. Merchants and commercial men are under the necessity of using credit as well as capital, and their affairs are not confined to any particular district, but spread over the "whole country. No single state could either secure to them the just fruits of their enterprise and skill, or grant them adequate relief in case their hazardous employments should prove unsuccessful. Hence the necessity for a national bankrupt law. But in the ordinary dealings between neighbor and neighbor, who are not engaged in the business of buying and selling as a livelihood, there could be no occasion for calling in the aid of the federal government. And besides, the condition and wants of the great mass of the people could not be so well understood by congress as by the local legislatures. These considerations render it highly improbable that the states have surrendered the powers which congress has attempted to exercise, and they are entitled to great weight in fixing the true interpretation of the grant.
If we intend to meet this question fairly, without warping the fundamental law to the exigency of the times, I cannot entertain a doubt that the fiamers of the constitution, when they used the word “ bankruptcies,” plainly referred to one, and only one of the two great legal systems touching the relation of debtor and creditor which had long been in operation. The conven *354 tion did not stop to define, because the matter was already well understood. The constitution speaks in the same way of taxes, duties, imposts, trial by jury, and many other subjects; and if we once depart from the sense in which the words were used and received at the time, a Avritten constitution Avill not be Avorth preserving; for it will either mean nothing, or else it Avill mean every thing, and include Avhatever interest, ambition or profligacy may desire. Chief Justice Marshall has told us, Avhat feAV will be disposed to question, that the enlightened patriots who framed the constitution Avere men Avhose intentions required no concealment. (9 Wheat. 188.) If they had intended to confer a poAver covering the Avhole relation of debtor and creditor, I cannot suppose that they Avould have confined themselves to a single word; or if they did, that they Avould have chosen one which most men would be likely to understand in a more restricted sense.
Bankruptcy is a legal term; Ave are discussing its meaning as used in a legal instrument; find Ave must go to the laAvs to ascertain its legal import. And to Avhat laAvs shall we go but to those of England under Avhich we had lived doAvn to the revolution 1 Will it be said that either the convention,- the states, or the people had in mind any other laAvs ? I presume not. But suppose Ave leave England, and cast our eyes over the rest of Europe. I have yet to learn that any government on the continent had a bankrupt law, eo nomine, or any thing Avhich ansAvered either in form or substance to the English bankrupt system, or to the one Avhich we have so recently had and repudiated. Most of the European states had the cessio bonorvm of the civil laAV, Avhich only relieved the debtor from imprisonment on surrendering his effects, and left his future acquisitions subject to be seized by the creditor. We must then return to England before Ave can find a bankrupt system Avhich will blot out the debt; and when Ave go there Ave can find no pattern for the insolvent or voluntary branch of our bankrupt laAV. Scotland has a bankrupt laAV Avhich differs in several particulars from the English system. But it Avill not answer the defendant’s purpose. It was not until Avithin a recent period that it *355 provided for the discharge of the debt. And, besides, I suppose no one will affirm that the convention referred to the Scotch, instead of the English bankrupt system.
Some considerations have been pressed into the argument which can have little or no just bearing upon the question. We are told that some of the states, prior to the revolution, had made enactments containing many of the features of a bankrupt system. That may be true. But they had never called them bankrupt laws. They had always been termed insolvent laws, or laws for the relief of insolvent debtors ; and if the convention intended to refer to those laws, they would have spoken of insolvency, instead of bankruptcy. The argument that the state laws contained some of the features of a bankrupt system, so far as it proves any thing; weighs against those who use it. As the states had never called them bankrupt laws, no one can say that such is their proper name, without comparing them with some bankrupt system; and this carries us back again to the laws of England. Before dismissing this head of the argument I must not omit to notice that, prior to the adoption of tiie federal constitution, there were very few if any state laws which discharged the debt; and whether we look at those laws before or after that period, I have never met with more than one which discharged the debt without the consent of the creditors as a class. With that exception, the consent of a large majority in value of the creditors has, I believe, always been required before the debtor could get any thing more than a release from imprisonment. The exception to which I allude is our own insolvent law of 1811. That law, as has already been noticed, was first condemned by the people, then repealed by the legislature, and finally declared unconstitutional by the supreme court of the United States. The law of congress which we are considering has already shared the same fate in two of the particulars which have been mentioned; and I trust that in due time the parallel will be completed.
The laws which have from time to time been made by congress for the relief of the debtors of the United States, whether called bankrupt or insolvent laws, prove nothing on this ques *356 tion. . Those laws are not referable to the power to legislate on ■ the subject of bankruptcy; but to the power of the creditor to . release his debtor. . ' '
The statute, 32 Geo. II, ch. 28, commonly called the lords’ act, enables the judgment creditor to compel the debtor to assign his property after he has remained three, months in prison. But whether the debtor moves voluntarily or by coercion, he obtains nothing but a release from imprisonment, aiid his future effects remain- liable for any balance which may still be due to the-creditor. (§ 16, 17.) The fact that this insolvent law has authorized the creditor, under particular circumstances, to become the moving party, is very far from - proving that the insolvent'and bankrupt systems are identical'. .Nor does it prove that the debtor may be the moving party under a bankrupt law;. or if "he may, that all power of coercion can be denied to the creditor.. .
The late'English bankrupt act, 6 Geo. IV, ch. 16, allows a trader to filé and publish a declaration “ that he is insolvent and unable to meet his engagements and this is declared to be “ an act of bankruptcy,” upon which a commission may issue, which will be valid although the declaration was concerted between the bankrupt and a creditor. (§ 6,7.) It would be sufficient to say, that this statute, passed in 1825, can prove nothing on the subject of .the powers-which had been delegated to congress in 1787. But if such a provision had existed before pur revolution, it would prove nothing in favor'of the defendant. The statute only adds another to the various acts of the trader which.- are to be deemed acts .of bankruptcy, upon which the , creditors may take out a commission, if they think proper.
' The act of bankruptcy was always the act of the debtor. But beyond that, he- never had before, nor has he now, the power to put the machinery in motion, and demand a discharge. It still remains for the creditors to sue out a commission or not at . their pleasure, and if they do not move, the debtor is just as powerless now as he was before.
It is upon such shreds and patches as those which have just been mentioned that -an attempt is made to confound the bank *357 rupt and insolvent systems, and thus make out that a power to legislate upon one of those subjects includes both of them. If the word used in the constitution had been insolvency, there would have been some plausibility in the argument; for that word, taken in its largest sense, extends to all cases of inability to pay debts. But bankruptcy, as I have attempted to show, is a legal or technical term, which has a much narrower signification. “ Bankruptcy is a status or condition fixed by legislative provision’’ (2 Bell’s Comm. 214.) A bankrupt, says Bailey, is “ one who, by the laws of the land, is obliged by his creditors to yield up his goods” &c. When a trader does certain acts tending to the injury of his creditors, the laws have spoken of him as being a bankrupt, or in a state of bankruptcy; but down to the year 1841 the laws have never held that language in relation to any other class of persons.
We know from the papers of Mr. Madison that when this subject was brought before the convention, the English bankrupt laws were expressly mentioned, and Connecticut voted against the clause, because the delegates from that state were unwilling to grant so large a power in relation to bankruptcies as had been exercised in England. (3 Mad. Pap. 1481.) But we do not need this evidence to satisfy any reasonable man that the members of the convention had in their minds the English bankrupt system. It was a system which had been in operation in their own country for more than two centuries ; and however men may reason upon the words of the grant, I can never bring my mind to the conclusion that the convention did not refer to that system in its great outlines, or that they intended to vest in congress a larger power upon this subject than had ever been exercised by the British parliament.
I shall say no more upon this branch of the case. Let it now be granted that congress may disregard all the leading features of the English bankrupt system, and make a law extending to all classes of debtors, placing the whole power in their hands, and denying all means of coercion to the creditor. And let it also be granted, that, As to future contracts, the law may provide for the discharge of the debt without the con *358 sent, in any form, of the creditor. The inquiry still remains "whether congress has power to make a law which shall retroact, and annul contracts which were made before the law vjas passed ; and that too without the consent of the creditor. As a citizen of this republic, where the powers of the government are limited and defined, and where the people have justly boasted of security in their persons and property against the exercise of despotic authority, I feel ashamed to be obliged to discuss such a question. An emphatic negative should be a sufficient answer to the proposition. But as it is insisted that the federal government has the power to nullify contracts, the argument to prove the position must be examined. I have already attempted to defend congress against the charge of having made such a law; and I will now endeavor to defend the enlightened patriots who framed, and the people who adopted the constitution, against the imputation of having delegated such a power to congress.
As men are always supposed to contract with reference to the law of the land, there is some propriety in saying that the law enters into and forms a part of the contract. When, therefore, there is a bankrupt system in operation at the time the credit is given, the debtor does not agree to pay in all events ; hut only that he will pay unless the debt shall be discharged in the mode already prescribed by law. It is upon this principle that the state insolvent laws have, to some extent, been taken out'of the prohibition against passing laws “ impairing the obligation of contracts.” But we are not now dealing with a prospective law; but with one which comes after the credit was given, and blots out the debt. Although some may think it a light thing for the legislature thus to nullify contracts, the announcement of such a doctrine cannot fail to shock the moral sense of every right minded man in the community. Discharging the debt which B. owes to A., is precisely the same thing in principle as taking the goods or the house of A. and transferring them to B. In either case A. is deprived of his property against his will, and without any fault on his part. Such a law strikes at the foundation of the social compact. Governments are instituted *359 for the security of life, liberty, and property; and to say that the people have granted to their servants the right to attack private property, is equivalent to saying that they have delegated the power of defeating one of the great ends for which the government was established.
It is said that, as this law provides for a distribution of the debtor’s property, the creditor gets all that he has a right to demand. That argument was met and overthrown by Chief Justice Marshall, in passing upon the validity of our state insolvent law. He says: “ It has been contended that as a contract can only bind a man to pay to the full extent of his property, it is an implied condition that he may be discharged on surrendering the whole of it. But it is not true that the parties have in view only the property in possession at the time the contract is formed, or that its obligation does not extend to future acquisitions. Industry, talents and integrity constitute a fmid which is as confidently trusted as property itself. Future acquisitions are therefore liable for contracts, and to release them from this liability impairs their obligation.” (Sturges v. Crowninshield, 4 Wheat. 122, 198.) The inability of the debtor to pay, whether it arises from his fault or his misfortune, cannot annul his obligation. A contract is in its very nature indissoluble without the consent of both parties. Nothing but performance, death, or mutual agreement can put an end to it. Indeed, death does not dissolve it. The obligation survives the,debtor as a charge upon his estate, and the heir or distributee takes the property cum onere.
The states are forbidden to pass any law “ impairing the obligation of contracts.” But this was not done for the purpose of securing a monopoly of that species of fraud to congress. As the power to annul contracts had not been delegated to the federal government, there could be no necessity for extending the prohibition to congress. But for more abundant caution the states have since made several amendments to the federal constitution, which now constitute the paramount law; and the fifth of those amendments extends the prohibition in still broader terms to the action of the federal government. The words *360 are: “No person shall be deprived of life, liberty, or property,, without due process of law.” This extends to choses in possession, as well as those in action; while the inhibition upon the states only extends to the latter. This amendment has been copied into our state.constitution, and its influence upon legislative action was considered in Taylor v. Porter, (4 Hill, 140,) . and the cases 4b.ere cited. Without stopping to inquire how much ground it covers, it is enough for the present to say, that it cannot mean less than that the legislature shall not take the property of one. man, against his will and without his fault, and give it to another.. That would be depriving him of his property “ without due" process of law.’’ I do not, however, wish -to lay much stress -upon this amendment, for neither of the negative clauses which have been mentioned was at all necessary. The people have never delegated to the government the power of annulling contracts, and having made no such grant, there ' was no occasion for forbidding its exercise. When I commission a man to sell my horse, it clearly cannot be necessary to add a clause forbidding him to seize my ox, or tear down-my house. Several of the negative clauses in the federal and state constitutions, and these among the number, are only valuable by way of showing how industriously the people have attempted to shield themselves against encroachments by the government.
The right to annul contracts has certainly not been given to congress ip terms, and if it can be'found in the constitution it must be because it is included iti the bankrupt power. ' The argument from " that clause commences by changing the word “ bankruptcies” into insolvency, and then proceeds thus: Congress may legislate on the subject of insolvency; this-includes the whole subject,oí insolvency, and the power of congress over it is .just as ample as that which 'might be exercised by the British parliament: parliament can annul contracts, and therefore congress may do it. This is the substance ahd whole force of the argument so far as it' has ever come to my ears. Í have already entered my protest against changing the words of the grant, and shall therefore say nothing more upon that point. *361 Let this law have the benefit of the change, and we will then see whether that will be enough to support it.
I deny at the outset that the powers of the government in this country, where we have written constitutions," can be justly measured by what has been termed the omnipotence of parliament. That body has no written law to define the limits of its authority. It makes its own constitution. Magna charta exerts only a moral influence: it interposes no other barrier. Public opinion constitutes the only conservative principle of the government. Short of working miracles, parliament may do what it pleases; for there is no standard by which to try the validity of its acts. I know it has been said that acts of parliament which are “ against common right and reason,” are void. (8 Co. 118.) But Blackstone has shown us that such is not the law of England. (1 Comm. 91.) When, therefore, we speak of the power of parliament over a given subject, there is no question of construction in the case. But when we come to governments deriving their authority from written constitutions, the case is far otherwise, If the power to do the. particular thing has not been granted in express terms, but is to be inferred from general words, a question of construction immediately springs up. What is the just and reasonable interpretation of the grant'? Does it, when fairly expounded, include the matter in hand 1 If it does not, the thing cannot be done, although it may come within the letter of the grant. Parliament may blot out debts; but it does not, like congress, act under a power to legislate on the subject of insolvency, but under a power to do whatever it pleases, not only in relation to insolvency, but every thing else. We see, therefore, that there is an litter fallacy in the argument which gives this power to congress because the British parliament has it. The same course of reasoning would prove that congress might attaint the creditor of high treason, for that may be done by parliament.
We are then brought back to the inquiry whether, under the power to legislate on the subject of bankruptcies, congress can annul debts which were contracted before the law was passed. Now I take it to be a sound principle that no power conferred *362 in general terms should be so construed as to take in all the absurd and wicked consequences which may by possibility be deduced from it. The powers of government, like those which are granted by one individual to another, should receive a reasonable construction. They should neither be frittered away by refined and artificial distinctions, so as to defeat the legitimate ends for which the government was established; nor should they be magnified by overstrained constructions, so as to include cases which it is absurd to suppose were contemplated by the parties to the compact. It must always be important to consider whether the power speaks of the particular thing to be done in express terms; or whether the right to do the thing can only be made out by tracing the power into its remote consequences. If the people should by express words confer on congress the power to hang a merchant who had become insolvent in consequence of the loss of a ship, it is not necessary for me to deny that the power might be exerted. But if the right to take the life of the same unfortunate merchant was to be deduced from a power to. legislate on the subject of insolvency, no one ■ would feel any difficulty in deciding that the power did not reach so far. Although the case might come within the general words of the power, all men would agree that taking the life of the insolvent merchant could not have been within the intention of the parties to the compact, and consequently was not within the grant. Now, although life is more dear to us than property, yet the same great principle which protects the one, extends to the other also; and we have no better right to follow out a power into remote and unjust results for the purpose of reaching property, than we have xyhen the purpose is to take life. The two acts will differ in the degree of wickedness, but their moral qualities will be of the game kind.
Although the powers of parliament haye no constitutional limit, the English courts have .often restricted the operation of .statutes; and this has been done on a principle whiph is directly applicable to the question before us. If parliament should, in express terms, direct a thing to be done which is contrary to reason and justice, the mandate must be obeyed, “ Put,” *363 says Blackstone, “ where some collateral matter arises out of the general words [of the statute] and happens to be unreasonable ; there the judges are in decency to conclude that this consequence was not foreseen by the parliament, and therefore they are at liberty to expound the statute by equity, and only quoad hoc disregard it. Thus, if an act of parliament gives a man power to try all causes that arise within his manor of Dale; yet if a cause arise in which he himself is party, the act is construed not to extend to that, because it is unreasonable that any man should determine his own quarrel.” (1 Comm. 91.) Now let us apply the principle. The people have not in express terms conferred upon congress the power to annul contracts, nor have they used any words which point directly to such a result. The authority of congress to do the wrong must dé made out, if at all, by the “ general words” in which the power is expressed: and I hold, with Blackstone, that “the judges are in decency to conclude that this consequence was not foreseen” by the convention or the people; and therefore the annulling of contracts is not within the power. The case put by Blackstone is a stronger one than this. The power was to try all causes arising in a particular district. There could be no question but that the man’s own cause was within the words of the grant. But here it is difficult to see how the case can possibly be brought within the words. What has the power to make laws—that is, rules of future conduct—on the subject of insolvency, to do with the plaintiff’s debt, which was due him before the law was passed 1 But waiving that consideration for the present, it is still a stronger case than the one put by Blackstone for restricting the operation of the general words in which the power is expressed. Although “ it is unreasonable that a man should determine his own quarrel)” it is still quite possible that the love pf justice, or the influence of public opinion, may lead him to a correct result; But this act of congress secures nothing to the creditor. It blots out the debt at once, and without even the forms of a trial. That is a most “unreasonable” result, which can only be reached by extending the power beyond its just limits.
*364 The authorities which were mentioned on another branch of the case—the construction of the bankrupt act—are directly in point, and go fully to support the same doctrine. I need not repeat the reference. And without multiplying authorities in support of a principle which is so obviously just and reasonable, I will content myself with mentioning one ortwo other cases by way of illustration. Blackstone tells us that “ the Bolognian law, mentioned by Puffendorf, which enacted 1 that whoever drew blood in the streets should be punished with the utmost severity,’ was held after long debate not to extend to the surgeon who opened the Vein of a person that fell down in the street With a fit." (1 Comm. 60.) Puffendorf says, “ it had like to have gone hard with him, [the barber or surgeon,] because it was added in the statute, that the words should be taken précísely, without any interpretation." (Puff. b. 5, ch. 12, § 8.) Now that was a case coming plainly within the words of the statute; and, what is very remarkable, the right of interpretation was ekpressly taken away; and yet the judges did not condemn the worthy surgeon. They could not bring themselves to the conclusion that the law-makers foresaw and intended so unjtist a Consequence as that of punishing a man who had opened a vein to save life. I will only add the reasoning of Mr. Justice Story, when delivering the opinion of the court in Wilkinson v. Leland, (2 Peters, 627, 657.) After mentioning that the power to make laws had been granted in the most ample manner by the Rhode-Island charter, he says, “ that government can scarcely be deemed to be tree, where the rights of property are left solely dependent upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and dislegard them—a power so repugnant to the common principles of justice and civil liberty —lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the *365 will of the people. The people ought not to be presumed to part with rights so vital to their security and well being, without very strong and direct expressions of such an intention.” He adds, “ we know of no case, in which a legislative act to transfer the property of A. to B. without his consent, has ever been held a constitutional exercise of legislative power in any state in the union. On the contrary, it has been constantly resisted as inconsistent with just principles, by every tribunal in which it has been attempted to be enforced. We are not prepared,- therefore, to admit, that the people of Rhode-Island have ever delegated to their legislature the power to divest the vested rights of property, and transfer them without the assent of the parties.” Now here, no special power to annul contracts can be found in the constitution; but it is said that such a power may be found “ lurking under a general grant of legislative authority” over “ the subject of bankruptcies”—or insolvency, as has been granted for the purposes of the argument. But I deny that this general grant can be rightfully pushed to such an extreme as to include contracts which were made before the passing of the law. Such a consequence was never intended by the convention, the states, or the people. It is an unreasonable and strained construction of the power, and ought not to prevail. It is undoubtedly much more common to magnify powers which have been conferred upon the government, than those which have been granted to individuals. But I am not aware of any principle upon which a distinction can be maintained. Constitutional governments, as well as individual agents, act under a compact between themselves and their principals ; and I see no reason why their charters should not in both cases be subjected to the same rules of construction.
Let us now apply the principle asserted by this law to other subjects of legislation. Congress has power to lay and collect taxes, duties, imposts, and excise: to regulate commerce, and to declare war. Can congress lay a new duty on the goods which the merchant imported the year before; or can any one be taxed on account of the property which he once owned, but had sold *366 before the law was passed? After the merchant’s ship has sailed with proper papers, can congress subject him to a penalty or forfeiture because some other document was not procured? After our people have had intercourse with those of another nation, in time of peace, can congress give a retrospect to a declaration of war, and thus render that intercourse illegal ? I presume no one will say that any of these things can be done. And yet in each of the supposed cases the power of congress over the subject is given in as broad terms, to say the least, as the power over bankruptcies; and no qualification has, in terms, been annexed to it. Still the power has a limit, resulting either from the nature of our institutions, or the rule of construction which has been mentioned. The general words in which the power is expressed should not be carried out into remote and unjust results which could not have been in the minds, or within the intention of the parties to the compact. I will put another case. Under the power to regulate commerce, congress may, perhaps, forbid the making of contracts of'a particular kind connected with trade. But after a contract has been made, which was lawful at the time, will any one pretend that congress can declare it void ? I presume not.
If then it be conceded, as has been ■ thus far assumed, that the authority to annul contracts may possibly be deduced from the bankrupt power, I hold that upon well established principles—such as have been and must be acknowledged in every enlightened community—the power should not be so construed as to touch this debt.. It is against reason and justice. But the authority to annul contracts, whether made prior or subsequent to the passing of the law, can only he deduced from the bankrupt power by supposing that the convention had in view the English bankrupt system. Under that, the debt is discharged. But the advocates for this law are compelled to reject that system, because it will not answer their purpose. It is confined to traders, and is a compulsory remedy in the hands of the creditor; and besides, the debtor cannot be discharged without the consent of his creditors as a class. Let us lay the English *367 bankrupt laws out of the case, and how will the question then stand? Congress may legislate “ on the subject of bankruptcies”—or insolvency, as the advocates for this law would have the constitution read. Under this power, laws may be passed to deter men from contracting debts which they either want the ability or the will to pay. The insolvent debtor may be punished. His goods, and even his body may be seized for the purpose of compelling him to discharge his legal obligations. But where is the authority for punishing the creditor ? He is not the insolvent, and the power says nothing about him. If we do not consider the constitution as referring to the English bankrupt system, it is impossible to maintain that the annulling of the debt comes within the scope of the power. If it be said that both debtor and creditor are included in the term insolvency, then I answer, that in the same sense both the thief and the man whose goods may be stolen are included in the term larceny; and yet who would think that a power to punish larceny would authorize congress to punish the unfortunate man who had lost his goods. I repeat, therefore, that unless we take the term “ bankruptcies” as it had been used and understood prior to the adoption of the constitution, there is no color of authority for blotting out the debt; and if we take the term as it had been used and understood before the constitution was framed, the voluntary branch of this law cannot be supported for the reasons which have been assigned on another branch of the case.
There is still another view of this question which is very satisfactory to my mind. Congress has no judicial power over the subject of insolvency. The power is “ to establish uniform laws” on that subject. A law is a rule of action. It looks to the future. It prescribes the rule of right and of duty for the time to come. But congress has attempted the exercise of judicial powers. It has legislated backward instead of forward, and thus passed judgment upon existing obligations. It has not declared what shall be the force of contracts thereafter to be made, or when, or under what circumstances the obligation of such *368 : contracts shall ceasé. If that had been done, men would then have known how to govern themselves when asked to part with . their money or property upon credit. But congress has said . that contracts already made shall be blotted out. This is nothing less than a judgment of forfeiture against creditors. It is a sentence, confiscating their property for the benefit of the debtor. It is a downright misnomer to call it a law. When congress says that debts thereafter to be contracted may in a certain event be discharged without payment, it speaks the. language of legislation. But when it undertakes’ to nullify a contract already in .' existence, it assumes an office which does not belong to it. It mounts the judgment seat, and, like other usurpers, condemns • men who are without fault. No transgression is laid to the ■ plaintiff’s charge, and if congress can condemn him to the loss of his debt, it can seize his goods of equal value, and give them •to the defendant.' There is no difference in principle between the two cases. Such things, cannot be rightfully done. Our frame of government was settled by enlightened, honest, industrious and frugal men, who held sacred the obligation of contracts. I doub.t not that they could sympathise as warmly with • unfortunate debtors as the men of the present day. But they .rightly judged that it was for the creditor —not the government— ' to decide for himself when he would be generous and forgive ■the debt. They did not undertake to regulate men’s charities; but if they had, they would as soon have-confiscated a chose in '.possession, as one in action. .In my humble judgment the constitution gives no color for the argument that congress may-make retroactive laws against creditors.
I have spoken plainly of this law1, not because it gave me any pleasure to do so, but because I thought the occasion called for it. The law is based upon false and dangerous principles. Congress has undertaken to legislate for the past, as well as the future ; and instead of leaving men to bear the consequences of .their own follies and misfortunes, an attempt has been made to transfer their burdens to the shoulders? of "other men. The law benefits one class of' citizens at the expense of another, and ■it cannot be carried into execution without producing that un *369 just result. It is a measure of the same general character with the “stop laws” of some of the states, and the various other devices which have been resorted to for the purpose of enabling men to throw off then legal obligations. Such measures are calculated to overthrow credit, corrupt the morals of the people, and destroy all confidence in the justice of the government. My opinion of the character of such enactments was briefly expressed in Stone v. Green, (3 Hill, 469,) and it remains unchanged. But great as are the mischiefs which have already resulted from such laws, they are not comparable with the consequences which may follow, should the bankrupt law be upheld as a constitutional exercise of power. That mode of interpreting the constitution which will support the law can fall little short of asserting the principle, that the federal government may do any thing which is not expressly forbidden. There is a constant tendency in the legislative department to enlarge the boundaries of its authority; and if the judiciary shall from any cause fail to discharge its office of upholding and defending the fundamental law against these and all other encroachments, the patriot will have much cause to apprehend that the experiment of free institutions will ultimately prove a failure. Although I am no alarmist, I am among the number of those who believe that the union can gain nothing, either in usefulness or stability, by magnifying the powers of the federal government at the expense of the states and the people. That is not the way in which any thing can be finally gamed; but it is the way in which all may be lost.
I desire not to be understood as entertaining any hostility to a proper bankrupt system. On the contrary, I deem such a system highly expedient in a country like this, where there are several independent governments in operation, and where so many of the people are engagedin trade and commerce. A bankrupt law is necessary to secure to creditors their just rights, and to afford adequate relief to those, who, from the nature of their pursuits, are subject to sudden and unforeseen reverses of fortune. But those classes which are not connected with trade, neither need, nor Could they endure a national bankrupt system. *370 So far as they require relief from the burden of debts, there is no reason for apprehension, judging from the past, that they will not obtain from the state legislatures all that Cari properly be granted. And a compulsory bankrupt law, the only one which I think constitutional, would be more than they could bear!
Since my opinion was prepared, Í have received two other opinions upon the same subject; one by Judge Wells of the U. S. court for the district of Missouri, who agrees with me that the voluntary branch of the law cannot be supported; (2 N. Y. Legal Observer, 185;) and the other by Mr. Justice Catron, who has arrived at a different conclusion. (1 Howard, 277, note.) Beyond the weight of authority which the name of the learned judge last mentioned justly Carries with it, I see nothing in his opinion which is calculated to shake the convictions of my judgment. After what has already been said, I shall only notice one or two things. The learned judge has 11 purposely avoided any attempt to define the mere word bankruptcyand has contented himself with affirming, that the power “ extends to all cases where the law causes to be distributed the property of the debtor among his creditors ; this is its least limit. Its greatest is the discharge of the debtor from his contracts. And all intermediate legislation, affecting substance, and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of congress.” The power is to make laws “ on the subject of bankruptcies,” and no “ limit” of any kind is mentioned in the constitution. How then can any boundary be affixed to the power, except .by «regarding it as pointing to some bankrupt system ? Clearly there is none. The very fact that the learned judge has mentioned limits, proves that no lawyer can read and reason upon the power without considering it as pointing to the English bankrupt system, which provides for “ distribution and discharge.” If that be so, then what authority can there be for taking one or two things contained in that system, and rejecting all the rest? Why go beyond traders ? Why place the power in the hands *371 of the debtor, and deny all remedy to the creditor 1 Why discharge debts without the consent of the creditors as a class 1 And why nullify contracts which were made before the law was in existence ? I will not say that these questions cannot be answered; but I will say that as yet no answer has been given.
I have been particularly struck with the difficulty which the learned judge found in getting over the objection that this law violates contracts. Indeed, I do not perceive that he has got over it, unless it be by a leap. But the fault is not his : it is in the law. There is no legal highway across that gulph. He says “ the great object of giving the bankrupt power to congress was to deprive the states of the dangerous power to abolish debts.” With great submission, I think otherwise. That end was fully accomplished by another clause of the constitution, which directly prohibits the states from passing any law “ impairing the obligation of contracts.” The mere existence of the bankrupt power has not even touched the jurisdiction of the state legislatures.
But I will not piusue the subject. It is easy to affirm that this law is. warranted by the bankrupt power. But any one who attempts to assign the reasons for such an opinion, will, I think, find that he has entered upon a most difficult task.
My conclusion is, that the voluntary branch of the bankrupt law is unconstitutional, for the following reasons:
1. It is not confined to traders, but extends to all classes of debtors.
2. It places the whole power in the hands of the debtor, without giving any means of coercion to the creditor.
3. It discharges the debt without the consent of the creditor in any form, and so violates the obligation of the contract.
4. If it retroacts so as to discharge debts contracted before its passage, then it not only violates contracts, but it goes entirely beyond the scope of the bankrupt power. It is not a law, but a sentence or judgment against creditors, and congress has no judicial power over the subject.
*372 For these reasons I am of opinion that the second plea is bad in substance as well as form. But I find that my brother Co wen has arrived at a different conclusion in Kunzler v. Kohaus and Visser, (ante, p. 317;) and the chief justice agrees with him in opinion. The plaintiff is therefore only entitled to judgment on account of such defects in the plea as may be cured by amendments.
Judgment for the plaintiff.